**POWELL, TRACHTMAN, LOGAN, CARRLE,**
   **BOWMAN & LOMBARDO, P.C.**
By:    Paul A. Logan        Attorney ID No. 30119
475 Allendale Road, Suite 200
King of Prussia, PA 19406
Telephone:  (610) 354-9700 / Fax: (610) 354-9760
Attorneys for Plaintiffs

---

                       :

**Robert Vitols, individually and as Executor**
 **of the Estate of Elmars Vitols** and          :
**Valda Amoroso** and             :
**Ingrid Stemme**
**Vitols Tool & Machine Corp.**
**Vitols Associates**
10082-84 Sandmeyer Lane        :
Philadelphia, PA 19116          :
               Plaintiffs    :
       vs.              :
**Kevin McCreery**   and       :
500 York Road, Suite 250       :
Jenkintown, PA 19046        :
**Andrew Zelenkofske**
6480 Rockside Woods Boulevard South  :
Suite 330              :
Cleveland, OH 44131            :
**CBIZ Business Solutions, Inc.** and   :
500 York Road, Suite 250       :
Jenkintown, PA 19046        :
**ZA Business Services, Inc.**  and   :
500 York Road, Suite 250       :
Jenkintown, PA 19046        :
**Zelenkofske Axelrod, LLC**

               Defendants    :

## <u>COMPLAINT</u>

1.    Plaintiff Bertram Loeb (hereafter "Loeb" or "Bert"), is an adult individual residing at 333

Lewis Road, Springfield, PA 19064. At all times relevant, Bert has a third grade

education.  In addition, Bert  is:

        i.       An owner of  2.9% of Beta Corporation, outright;

    ii.      The Settlor of the Bertram Loeb Irrevocable Trust dated November 13, 1996 with Bank of America (as successor-in-interest to Nationsbank) and Herbert Garten, co-trustees;

    iii.     An annuitant to a private annuity agreement dated March 31, 1998 with Bank of America (as successor-in-interest to Nationsbank) and Herbert Garten, co-trustees;

    iv.     A fifty percent (50%) beneficiary of the Celia Lust Kolby Trust dated June 21, 1971. Bank of America and Herbert Garten are co-trustees; and

    v.      A director of Beta Corporation.

2.      Defendant Herbert S. Garten, Esquire(hereafter "Garten") is an attorney licensed to practice in Maryland. In addition, Garten is:

    i.       Personal attorney to Bertram Loeb;
    ii.     Personal attorney to Celia Lust Kolby, deceased;
    iii.    Principal in the law firm of Fedder & Garten, P.A.;
    iv.    Co-trustee of the Bertram Loeb Irrevocable Trust;
    v.     Co-trustee of the Celia Lust Kolby Trust;
    vi.    Co-trustee of the Malcolm Loeb Irrevocable Trust;
    vii.   President and Secretary of Beta Corporation;
    viii.   Director of Beta Corporation;
    ix.    Outside counsel to Beta Corporation; and
    x.     Property manager of the real estate owned by Beta Corporation.

3.      Defendant Sheldon G. Dagurt, Esquire (hereafter "Dagurt") is an attorney licensed to practice in Maryland. In addition, Dagurt is:

    i.       A member of the law firm of Fedder & Garten, P.A.;
    ii.     Vice-president and Treasurer of Beta Corporation; and
    iii.    Director of Beta Corporation.

4.      Defendant Bank of America (hereafter "Bank"), upon information and belief, is a Delaware corporation. Bank of America is the successor-in-interest to Nations Bank, which is successor-in-interest to Maryland National Bank. In addition, Bank of America is:

    i.       Co-trustee of the Bertram Loeb Irrevocable Trust;
    ii.     Co-trustee of the Celia Lust Kolby Trust; and
    iii.    Co-trustee of the Malcolm Loeb Irrevocable Trust.

5.      Defendant Fedder & Garten, P.A., is a Maryland law firm with offices located at 2300 Charles Center South, 36 South Charles Street, Baltimore, Maryland.

## Background for Beta Corporation

6.    As a matter of providing background, Sidney Lust, Plaintiff's uncle died in 1955 owning 100% of the stock in two (2) closely held Maryland Corporations: Alpha Corporation and Beta Corporation.

7.    The assets of Alpha Corporation consisted primarily of commercial real estate located in Greenville, Maryland.

8.    The assets of Beta Corporation consisted primarily of commercial real estate located in Bethesda, Maryland and of commercial real estate located in Beltsville, Maryland.

9.    On the death of Sidney Lust, the stock of Alpha and Beta Corporations passed in part to his wife, Celia Lust Kolby, and the remaining stock passed to his son, Bernard Lust.

10.   Bernard Lust ran the day-to-day operations of Alpha and Beta until 1970 when Celia Lust Kolby discovered that Bernard had been stealing from the companies.

11.   At that time, Celia Lust Kolby hired defendant Garten to replace Bernard from the Companies.  Garten threatened to expose Bernard to the authorities unless Bernard relinquished his interests in Alpha and Beta.

12.   Subsequently, Bernard gave all of his interests in Alpha Corporation and Beta Corporation to Celia.

13.    Forever indebted, Celia essentially gave Garten complete control over her financial affairs from that point forward.

14.   Defendant Garten has been on the Board of Directors and President of Alpha and Beta Corporations since 1971.


**The Celia Lust Kolby Trust.**

15.   On June 21, 1971, Garten prepared the Celia Lust Kolby revocable trust (hereafter, the "Kobe Trust"). It is believed that Celia initially funded the Kolby Trust with all of her stock in Alpha and Beta Corporations.

16.   At about that same time, Garten also prepared a durable power of attorney for Celia whereby Garten was named as the attorney-in-fact for Celia.

17.   At all times relevant, the situs and applicable law for the Kolby Trust is Maryland. At the time of the trust, Celia was a Florida resident.

18.   Maryland National Bank, Herbert Garten and Celia's third husband, Phillip Kolby were named as initial trustees. The Kolby Trust provides that Celia's sister, Harriet C. Hammel

would serve as successor trustee to Phillip Kolby. The Kolby Trust does not provide any means by which to remove or replace any other trustees.

19.     The Kolby Trust provides that upon Celia's death, the trust would be split into five (5) equal shares: a share for Celia's sister, Harriet Hammel; a share for Celia's sister Anne C. Loeb; a share for Celia's sister, Julia Cooperman; a share for Celia's nephew Malcolm Loeb; and, a share for her nephew, Bertram Loeb.

20.     Each beneficiary would receive all of the net income and so much principle as needed for their health, maintenance, support and general welfare.

21.     As to the trusts for Harriet, Anne and Julia, the trust would continue for their beneficiary's issue.  Should either of them die without issue, then that trust share would be added to the trusts of the remaining beneficiaries.

22.     Harriet and Julie died without issue.  Only Anne died, leaving Malcolm and Bertram as surviving issue.

23.     The Kolby Trust provided that Malcolm and Bertram each had a power to withdraw 50% of the trust corpus when they reached 52 years old.

24.     On their death, their trusts would continue for their issue who had rights to withdraw: 1/3 at 25 years; ½ at 30; and, the entire corpus at 35.

25.     Article Six specifically provides that only Garten and the corporate trustee shall be entitled to probate commission of 2% of the value of the trust estate on Celia's death.


**Celia Dies**.

26.     Sometime during the years 1978 and 1979, Celia started to showing signs of dementia.

27.     Phillip Kolby died in 1981 and Harriet C. Cooperman became successor co-trustee of the Kolby Trust.  At the time, Harriet was 81 years old.

28.     On or about May 1984, Celia died.

29.     Per Article Six of the Kolby Trust, defendants Garten and Bank of America took a probate commission of almost ***$300,000, ?????***.

30.     Additional legal fees were incurred to probate the estate.

31.     Florida legal counsel was retained because Garten was not a licensed attorney in Florida and estate assets were located in Florida.

32.     Defendants Garten and Bank of America ensured that their commissions were paid first

from estate assets.

33.     However, once those commissions were paid, the estate lacked sufficient liquid assets to pay the death taxes.

34.     As such, Garten and Bank of America, as trustees, directed the sale of the assets of Alpha Corporation to pay the estate taxes.

**Beta sells the Beltsville, MD Property, and Buys the Oxnard, CA Property.**

35.     In 1988, Garten, Garten, as Director, President and Secretary of Beta, and as co-Trustee of the Kolby Trust, caused Beta Corporation to sell the Beltsville, MD property as part of an IRC 1031 tax-deferred exchange. In that same capacity, Garten hired himself and his law firm, Fedder and Garten, P.A. to serve as counsel for the transaction.

36.     Garten subsequently directed the purchase of commercial real estate in Oxnard, California.

37.     The Oxnard property was purchased in part by Beta, and in part by the Kolby Trust so that Beta currently owns 84.176 % of Oxnard, and Kolby Trust owning the balance.

38.     At closing, defendants Garten and Fedder & Garten took a real estate commission of approximately $441,000. Additionally, defendants Garten and Fedder & Garten took their hourly fees incurred as part of the same transaction.

39.     At all times relevant to the IRC 1031 exchange, the Kolby Trust owned a controlling interest in Beta Corporation.

40.     At no time did Plaintiff, Beta shareholders (other than the Kolby, Loeb or Malcolm Trusts), or any trust beneficiaries, approve or consent to defendants' fees/commissions.

41.     The fees and commissions generated by these actions were derived as a direct result of Garten's relationship with the trust property and the beneficiaries of the trusts.

42.     Garten's attempt to act as a trustee, an officer and director of Beta Corporation, and as outside counsel to Beta Corporation during this transaction created an actual conflict of interest.

43.     In 1989, Plaintiff's mother, Anne C. Loeb died.

44.     At some time during 1990 through 1991, both of Harriet and Julia were hospitalized in Pennsylvania. During this time, defendant Garten traveled into the Commonwealth and prepared wills for each of Harriet and Julia.

45.     Garten charged each of them $40,000 for preparation of the wills.

**Beta Refinances the Oxnard, CA Property.**

46.     On July 11, 1994,  Garten, as Director, President and Secretary of Beta,  and as co-Trustee of the Kolby Trust, caused Beta Corporation to refinance a $3,433,614 loan on the Oxnard, CA property.  In that same capacity, Garten hired himself and his law firm, Fedder and Garten, P.A. to serve as counsel for the transaction.

47.     At closing, defendants Garten and Fedder & Garten took a commission of $175,000.

48.     The fees/commissions generated by these actions were derived as a direct result of Garten's relationship with the trust property and the beneficiaries of the trusts.

49.     The amount refinanced was $4,040,000.

50.     At the same time, Nations Bank took a $25,000 commission.

51.     Other entities were paid for professional fees and/or commissions as part of this transaction.  Upon information and belief, Plaintiff believes that defendants Garten, Fedder & Garten, and Bank of America received some form of  monetary or non-monetary benefit from the provider of these services as consideration for allowing these other entities to participate and receive fees as part of the subject transaction.

52.     At no time did Plaintiff, Beta shareholders (other than the Kolby, Loeb or Malcolm Trusts), or any trust beneficiaries, approve or consent to defendants' fees/commissions.

53.     The fees and commissions generated by these actions were derived as a direct result of Garten's relationship with the trust property and the beneficiaries of the trusts.

54.     Garten's attempt to act as a trustee, an officer and director of Beta Corporation, and as outside counsel to Beta Corporation during this transaction created an actual conflict of interest.


**Harriet and Julia Die.**

55.     One June 4, 1995 Harriet Hammel died a resident of Florida.

56.     On November 13, 1995, Julia Cooperman died a resident of Florida.

57.     Defendant Garten did not prepare the wills or trusts for either Harriet or Julia.

58.     Harriet and Julia disliked and distrusted defendant Garten.

59.    Bertram Loeb and Malcolm Loeb were named as co-executors for each of their estates.

60.    Adam Bankier, Esquire was retained by the co-executors as attorney for each estate.

61.    At both of Harriet's funeral, and Julia's funeral, each located in Florida, defendant Garten appeared, uninvited.

62.    Defendant Garten offered to review the estate tax returns, for free.  The co-executors agreed.

63.    Not until November 1996 did Bertram discover that defendants Garten and Fedder & Garten took an $87,500 fee against Harriet's estate, and a $96,533 fee against Julia's estate.

64.    At no time did plaintiff or Malcolm approve of defendant's fees/commissions.

65.    Immediately thereafter, Plaintiff and his son met with defendant Garten to object to the fees. Plaintiff demanded the fees be returned to the estate.

66.    Garten refused to return the fees.

67.    At about that time, Beta Corporation was in the process of redeveloping the Bethesda property.  Garten first reminded Plaintiff of how critical he was because only he possessed the skill and expertise required to complete the redevelopment project.

68.    Garten inferred that if Plaintiff continued questioning Garten's judgment and billing practices, Bethesda would not be redeveloped.

69.    With no other option available, Plaintiff backed-off until after the Bethesda property had been redeveloped.

70.    As a concession, Garten offered to prepare estate plans for Plaintiff and his brother, Malcolm.  Garten said he would prepare the plans at no charge.

71.    At all times relevant to this action, defendants Garten and Fedder & Garten never prepared an engagement/fee letter.

**Garten Represents Bertram Loeb: Bertram Loeb Irrevocable Trust**
**and Loeb Family Limited Partnership.**

72.    On November 13, 1996, Garten prepared the Bertram Loeb Irrevocable Trust (hereafter, the "Loeb Trust").  The Loeb Trust is a Maryland trust.

73.    At about this time, Plaintiff exercised his power of withdraw from the Kolby Trust and withdrew 94 shares of Beta stock from the Kolby Trust.

74.    The Loeb Trust was  initially funded with 94 shares of Beta stock.  Bertram has retained

the power to substitute property in the trust.  As such, the Loeb Trust is a grantor trust.

75.    At the time of the trust, Bertram was a Pennsylvania resident.

76.    Nation's Bank and Herbert Garten were named as initial trustees for the Loeb Trust. Garten's son, Lawrence M. Garten,  another member of Fedder & Garten, P.A., is successor trustee to Herbert Garten.   The individual trustee may resign and appoint a co-trustee.  Otherwise, the Loeb Trust does not provide any means by which to remove or replace any  trustees.

77.    The Loeb Trust provides that during Bert's life, income and principle shall be paid to Bertram's issue.  Principle distributions shall be used for the support, maintenance, health, education, comfort and general welfare of Bert's issue.  Upon Bertram's death, the trust splits into one share for each surviving child and one share for each deceased child leaving issue.  The shares shall be distributed outright should a beneficiary be over 35.

78.    Otherwise, each beneficiary would receive all of the net income and so much principle as needed for their general welfare and support, while considering other sources of income.

79.    On March 31, 1998, Garten prepared a private annuity agreement (hereafter, the "Annuity").  Plaintiff withdrew an additional 82 shares of Beta stock from the Kolby Trust.   Pursuant to the Annuity, Plaintiff sold the shares to the Loeb Trust trustees for a right to receive $64,809 a year for life.

80.    Since March 31, 1998, annuity payments have been comprised of income and no principle. Income earned from the 94 shares of Beta stock, initially transferred, has been used to pay the annuity each year.

81.    Defendants Garten and Fedder & Garten have billed Plaintiff $8,500 for this work.

82.    At about the same time, Garten prepared a similar trust for Malcolm Loeb (hereafter the "Malcolm Trust") except that the trust was for the benefit of Malcolm's issue.

83.    Malcolm Loeb died in 1998.

84.    Also at this time, Garten prepared a Maryland Family Limited Partnership for Bert (which was subsequently audited by the Internal Revenue Service). It is unknown whether he did the same for Malcolm.

85.    Bert initially owned all of the general partnership and limited partnership interests.

86.    As part of the estate plan, Plaintiff gifted his limited partnership interests to his wife, Maryanne.     Maryanne then used her unified credit and gave those limited partnership

interests to her step-sons, Curt and Daniel.  At the time, Maryanne did not like her step sons.

87.    At the time, Maryanne had been hospitalized and of ill health.

88.    Maryanne died in 1999.

89.    Garten admittedly deceived Maryanne to transfer the limited partnership interests to Plaintiff's sons.

90.    Defendants Garten and Fedder & Garten billed Plaintiff $20,000 for this work.


**Beta sells the Bethesda, MD Property.**

91.    On July 18, 2001, Garten, as Director, President and Secretary of Beta,  and as co-Trustee of the Kolby Trust, co-Trustee of the Loeb Trust, and co-Trustee of the Malcolm Loeb Trust, caused Beta Corporation to sell the Bethesda, MD property as part of an IRC 1031 tax-deferred exchange.  In that same capacity, Garten hired himself and his law firm, Fedder and Garten, P.A. to serve as counsel for the transaction.

92.    At closing, defendants Garten and Fedder & Garten took a real estate commission of approximately $331,620.   The commission is reflected separately on a HUD-1.

93.    Additionally, defendants Garten and Fedder & Garten were paid $105,390 in professional fees for this transaction.

94.    Other entities were paid for professional fees and/or commissions as part of this transaction.  Upon information and belief, Plaintiff believes that defendants Garten, Fedder & Garten, and Bank of America received some form of  monetary or non-monetary benefit from the provider of these services as consideration for allowing these other entities to participate and receive fees as part of the subject transaction.

95.    At all times relevant to the IRC 1031 exchange, the Kolby Trust, Malcolm Loeb Trust and the Lobe Trust owned a controlling interest in Beta Corporation.

96.    At no time did Plaintiff, Beta shareholders (other than the Kolby, Loeb or Malcolm Trusts), or any trust beneficiaries, approve or consent to defendants' fees/commissions.

97.    The fees and commissions generated by these actions were derived as a direct result of Garten's relationship with the trust property and the beneficiaries of the trusts.

98.    Garten's attempt to act as a trustee, an officer and director of Beta Corporation, and as outside counsel to Beta Corporation during this transaction created an actual conflict of

interest.

**Beta Buys the Loveland, CO Property.**

99.     Following the sale of the Bethesda property, on or about October 30, 2001, Garten, as Director, President and Secretary of Beta,  and as co-Trustee of the Kolby Trust, co-Trustee of the Loeb Trust, and co-Trustee of the Malcolm Loeb Trust, caused Beta Corporation to purchase a new property at Loveland, Colorado.  In that same capacity, Garten hired himself and his law firm, Fedder and Garten, P.A. to serve as counsel for the transaction.

100.    At closing, defendants Garten and Fedder & Garten were paid $35,000 professional fees for this transaction. A balance of $70,040.18 resulting from this transaction was due Fedder & Garten, but deferred.

101.    Defendant Bank of America was paid $35,000 in professional fees for unspecified services.

102.    Other entities were paid for professional fees and/or commissions as part of this transaction.  Upon information and belief, Plaintiff believes that defendants Garten, Fedder & Garten, and Bank of America received some form of  monetary or non-monetary benefit from the provider of these services as consideration for allowing these other entities to participate and receive fees as part of the subject transaction.

103.    At closing, Beta Corporation fell short by $638,893.  As a result, the Anne Loeb Trust, the Harriet Hammel Trust and the Julia Cooperman Trust lent money totaling $650,000 to Beta Corporation. Those loans have since been satisfied following the loan against the Loveland, CO property in 2002.

104.    At all times relevant to the IRC 1031 exchange, the Kolby Trust, the Loeb Trust and the Malcolm Loeb Trust owned a controlling interest in Beta Corporation.

105.    At no time did Plaintiff, Beta shareholders (other than the Kolby, Loeb or Malcolm Trusts), or any trust beneficiaries, approve or consent to defendants' fees/commissions.

106.    The fees and commissions generated by these actions were derived as a direct result of Garten's relationship with the trust property and the beneficiaries of the trusts.

107.    Garten's attempt to act as a trustee, an officer and director of Beta Corporation, and as outside counsel to Beta Corporation during this transaction created an actual conflict of

interest.

**Beta Borrows Against the Loveland, CO. Property**

108.    On or about March 8, 2002, Garten, as Director, President and Secretary of Beta,  and as
co-Trustee of the Kolby Trust, caused Beta Corporation to borrow $3,900,000 against the
Loveland, CO property.  In that same capacity, Garten hired himself and his law firm,
Fedder and Garten, P.A. to serve as counsel for the transaction.

109.    At closing, defendants Garten and Fedder & Garten charged a fee of approximately
$106,410 for the transaction.  The fees/commissions generated by these actions were
derived as a direct result of Garten's relationship with the trust property and the
beneficiaries of the trusts.

110.    A fee of $19,250 was paid to Netfunding.com, a mortgage broker.

111.    Other entities were paid for professional fees and/or commissions as part of this
transaction.  Upon information and belief, Plaintiff believes that defendants Garten, Fedder
& Garten, and Bank of America received some form of  monetary or non-monetary benefit
from the provider of these services as consideration for allowing these other entities to
participate and receive fees as part of the subject transaction.

112.    At no time did Plaintiff, Beta shareholders (other than the Kolby, Loeb or Malcolm
Trusts), or any trust beneficiaries, approve or consent to defendants' fees/commissions.

113.    Garten's attempt to act as a trustee, an officer and director of Beta Corporation, and as
outside counsel to Beta Corporation during this transaction created an actual conflict of
interest.

**Beta Corporation Today.**

114.    As of the date of the filing of this Complaint, Beta Corporation's assets are primarily two
commercial real estate properties: one in Oxnard, California; and, the other in Loveland,
Colorado.

115.    The net value of the assets owned by Beta is approximately $9,300,000.

116.    Beta Corporation nets approximately 4.6% income per year.

117.    Since 1995, the assets of Beta Corporation have grown by 0.65%.

118.    In addition to the various fees paid, defendants Garten and Fedder & Garten, PA have

been receiving a real estate management fee based upon income earned by the real estate since 1994.

119.    The owners of Beta Corporation are:

      i.      Bertram Loeb, 2.9%;
      ii.     Bertram Loeb Irrevocable Trust, 17.6%;
     iii.    Malcolm Loeb Irrevocable Trust, 20.5%;
     iv.    Celia Lust Colby Trust, 36.58%; and
     v.     Lust Family grandchildren, 22.42%.

120.    The other directors of Beta Corporation are Alan Snook (hereafter "Snook") and Karlyn Loeb (hereafter "K. Loeb"), the sister-in-law of Bertram Loeb and widow of Malcolm Loeb.

121.    As a result of his position as trustee to the Kolby, Loeb, and Malcolm Trusts, and as by way of exerting his influence as personal attorney to Celia, Malcolm Loeb and to Plaintiff, Garten named himself and Sheldon Dagurt, as officers and directors of Beta Corporation.

122.    At all times relevant, Plaintiff relied upon and trusted defendants Garten as his attorney, and trusted Garten and Bank of America as his trustees.

123.    At all times relevant, defendant Bank of America failed to object, abstain, or stop defendant Garten from profiting by way of his position as trustee to the trusts.

**Garten Violates his Fiduciary Duties**

124.    As detailed herein above, Garten wears at least ten (10) different "hats" when he is dealing with the Plaintiff Loeb and Beta Corporation.

125.    Chief among these is the "hat" that he wears as the trustee of the Bertram Loeb Irrevocable Trust, the Celia Lust Kolby Trust, and the Malcolm Loeb Irrevocable Trust.

126.    As a trustee, Garten is not permitted to place himself in such a position that the interest of the beneficiaries and his own personal interest do or may conflict.

127.    As a trustee, Garten owes an undivided duty of loyalty and a fiduciary duty to beneficiaries of the Bertram Loeb Irrevocable Trust, the Celia Lust Kolby Trust, and the Malcolm Loeb Irrevocable Trust.  Among those beneficiaries whom Garten owes that duty is Plaintiff.

128.    Garten, through his relationship with the Plaintiff as trustee, and the trust property, has repeatedly used his position for his own personal and professional gain.

129.    Most egregiously, Garten and his law firm have received over $1,000,000 in fees and

commissions from Beta Corporation as a direct result of his relationship with the trust property and the beneficiaries of the various trusts described above.

130. Garten has not received consent from the Plaintiff for any of the below listed violations of his fiduciary duty.

131. Garten, as trustee has never filed an accounting or sought any other judicial review of his actions.

132. As set forth in more detail below, Garten has repeatedly and seriously violated his fiduciary duties.

**Hiring his law firm to act as counsel to Beta**

133. As detailed above, through his fiduciary relationship with the Plaintiff, Garten appointed himself and his partner as officers of Beta Corporation.

134. As the only officers of Beta Corporation, Garten and his partner Dagurt hired their law firm to act as counsel to Beta Corporation.

135. Also, as the only officers of Beta Corporation, Garten and his partner Dagurt hired their law firm to act as a property manager for the properties held by Beta Corporation.

136. The fees generated by these actions are in excess of $1,000,000 and were derived as a direct result of Garten's relationship with the trust property and the beneficiaries of various trusts.

137. Each of the individual and business entity defendants listed above, are referred to jointly herein as ("CBIZ"), unless otherwise specifically indicated.

138. It is believed, and therefore averred, that each of the defendant business entities are either successors or alter egos of one another, and/or that some or all of the listed entities are one and the same entity that is trading under a different name.

139. Kevin McCreery is an adult individual, employee and agent of CBIZ and at all times acted on his own behalf or as an agent or employee of the other defendants.

140. Andrew Zelenkofske is an adult individual, and at all times relevant hereto, acted on his own behalf or as an agent of the other defendants.

141. At all times relevant hereto, based upon the representations of Andrew Zelenkofske, it is believed and therefore averred that Andrew Zelenkofske was an attorney licensed to practice law.

*inter alia*

The Last Will and Testament of Elmars Vitols. Elmars Vitols executed his Last Will and Testament on October 20, 1992.

2.     The "Robert Vitols Irrevocable Insurance Trust" dated November 23, 1992 ("Robert's Insurance Trust").

3.     The Irrevocable Life Insurance Trust of Elmars Vitols and Ruta B. Vitols. Elmars Vitols and Ruta Vitols exeuted this Trust on October 20, 1992 ("Elmars/Ruta Insurance Trust").

**Plaintiffs Professional and Other Relationships with CBIZ**

At all material times, CBIZ served as Vitols Tool & Machine Corp.'s accountants, business advisors and/or business consultants.

23.    Defendant, Andrew Zelenkofske also acted as the attorney for each plaintiff.

24.    As part of the relationship between Vitols and defendants, at all material times, each defendant was obligated to provide to each plaintiff and promised, represented warranted and agreed that they would provide to the plaintiff, at least the following:

1.     competent services and work products rendered with reasonable care and in conformance with all standards imposed by law and the legal and accounting professions;

2.     competent services and work products in accordance with their promises, representations and agreements;

3.     Services rendered for the benefit of the plaintiffs, and not for the benefit of defendants to the detriment of the Vitols' interests;

4.     full, complete and truthful disclosure of all material facts and information;

5.     services that conform in all respects to their fiduciary duties and duties of good faith, loyalty, reasonable care and the avoidance and/or disclosure of conflicts of interest.

25.    Defendants have violated their duties to Vitols, and have done so intentionally, maliciously and/or recklessly, with the intention of benefitting themselves at the expense

of Vitols and/or with reckless disregard for the harm their conduct would cause to Vitols, thereby causing Vitols to suffer certain damages, all as explained in more detail below.

26.  By way of example only, Robert Vitols, Valda Amoroso and Ingrid Stemme all sought the legal and accounting advice of advice of Andrew Zelenkofske, Kevin McCreery and CBIZ respecting their own business and estate planning.

27.  At no time during the professional relationship with Andrew Zelenkofske, Kevin McCreery and CBIZ were the individual plaintiffs advised of any potential or actual conflicts of interest, the advisability of each to obtain separate counsel and/or independent advice, the individual interests of Andrew Zelenkofske, Kevin McCreery and CBIZ and their actual and/or potential conflicts of interest.

28.  Further, at all material times, because of their professional and confidential relationships, Andrew Zelenkofske, Kevin McCreery and CBIZ knew of the wealth of Elmars Vitols and financial conditions of Vitols Tool & Machine Corp., Associates, Robert Vitols, Valda Amoroso and Ingrid Stemme.

29.  At all material times, Andrew Zelenkofske, Kevin McCreery and CBIZ knew that Elmars Vitols, Vitols Tool & Machine Corp., Associates, Robert Vitols, Valda Amoroso and Ingrid Stemme were not sophisticated in the areas of accounting, taxes, business planning and finance and that each plaintiff would rely upon them for advices and professional services.

30.  At all material times, the defendants knew that without accurate financial records, financial statements and tax returns, and professionally competent and impartial legal advice, it would be difficult or impossible for the plaintiffs to make informed business and personal decisions.

31.  Andrew Zelenkofske, Kevin McCreery and/or CBIZ all promised, represented and agreed that they  possessed the experience and expertise necessary to produce accurate financial records, financial statements and tax returns, as well as estate planning expertise.

32.  All plaintiffs foreseeably and reasonably relied upon Andrew Zelenkofske, Kevin McCreery and/or CBIZ's promises and representations, and otherwise agreed to continue to retain  Andrew Zelenkofske, Kevin McCreery and/or CBIZ to assume responsibility for these tasks.

## Deficient Legal Advice/Conflicts of Interest

Upon information and belief, Andrew Zelenkofske, with advice and counsel of others at CBIZ, prepared the estate planning documents for Elmars Vitols more particularly described above.

34. In the alternative, upon information and belief, Elmars Vitols' estate planning documents were prepared by Andrew Zelenkofske while he was an agent of CBIZ.

35. The Will and Irrevocable Insurance Trust documents appear to attempt an "estate freeze", however, because of the deficiencies in the plan and implementation of the plan have failed and exposed the Estate of Elmars Vitols and individual plaintiffs to potential adverse tax consequences.

36. By way of example only, the lack of re-titling of assets resulted in an apparently over-funded marital deduction trust.

37. The goals and objectives of the succession planning for the ownership and operation of Vitols Tool & Machine Corp. were not properly planned or implemented.

38. The combination of the failed estate freeze, over-funded martial deduction trust and deficiencies in the Irrevocable Insurance Trust suggests either the planned distributions were not as intended or that the Will did not reflect the true intent of Elmars Vitols.

39. The implementation of the estate plan was left undone or Elmars Vitols did not truly understand his own estate plan.

40. The individual plaintiffs may have been improperly disenfranchised of the proceeds of the residuary or marital trusts and Elmars Vitols' succession plans.

41. The estate planning documents prepared by Andrew Zelenkofske, including, but not limited to the Life Insurance Trust and Last Will and Testament of Elmars Vitols, name Andrew Zelenkofske as a primary or successor fiduciary.

42. Plaintiffs aver, upon information and belief that Andrew Zelenkofske, the drafter of the estate planning documents, named himself as fiduciary, i.e., e.g., co-executor of the estate of Elmars Vitols, for his personal financial benefit and that of Kevin McCreery and CBIZ.

43. Upon the death of Elmars Vitols, Andrew Zelenkofske assumed the position of co-executor, retained CBIZ and himself as professionals for the Estate, and personally benefitted from the self-dealing with the Estate.

44. Vitols aver, upon information and belief, that the activities of Andrew Zelenkofske and CBIZ were in violation of their fiduciary duties, constituted the transaction of business with clients, resulted in the sharing of legal fees among an attorney and non-attorneys and was a part of a pattern and practice of Andrew Zelenkofske, Kevin McCreery and CBIZ.

45. Vitols aver, upon information and belief, that Andrew Zelenkofske and CBIZ financially benefitted from the violation of their fiduciary duties.

46. Andrew Zelenkofske, Kevin McCreery and CBIZ all actively participated in the administration of the Estate of Elmars Vitols.

47. The plaintiffs have learned that the information reported on the tax returns filed on behalf of the Estate of Elmars Vitols contradicts other reports and returns prepared and filed by CBIZ, and is contrary to other books and records of Associates and Vitols Tool & Machine Corp.

48. The plaintiffs believe and therefore aver that the legal advice received from Andrew Zelenkofske respecting their estate and business planning was proffered for the benefit of Andrew Zelenkofske and CBIZ so as to allow Andrew Zelenkofske and CBIZ to generate fees and benefit at the expense of the plaintiffs.

## **Negligent Accounting, Reporting and Financial Advice**

## CBIZ's Billing Practices

was also periodically invoiced for "other" services, allegedly outside of the undefined scope of services for which Vitols paid a retainer; these "other" services were billed on an hourly rate.

55.                                                    did not provide documentation respecting the purported services and                                 has no record of requesting the services for which it was billed.

56.    The plaintiffs aver, upon information and belief, that CBIZ was invoicing                              and the Estate of Elmars Vitols without regard to the actual services provided and with the specific intent to be paid for services not performed or performed for different persons of entities than invoiced.

57.    For example, CBIZ demanded payment of the total sum of $50,000 from the Estate of Elmars Vitols and                                 , tendering two "invoices" totaling sum of $50,000, without regard to the actual services provided and which suggest a scheme to obtain payment for services which may not have been done and which overstated the entitlements to be paid by either the Estate of Elmars Vitols and/or Vitols Tool & Machine Corp.

58.    Upon information and belief, CBIZ's billing practices intentionally and improperly inflated the value of services provided, marked up time as a regular practice and procedure and invoiced from the Estate of Elmars Vitols and Vitols Tool & Machine Corp. for services not performed or invoiced from the Estate of Elmars Vitols and Vitols Tool & Machine Corp. for services within the scope of the "retainer" for Vitols Tool & Machine Corp. and/or invoiced entities not owing fees for alleged services performed for others.

59.    It is believed, and therefore averred, that CBIZ's pattern and practice of improper billing dates back to the inception of the relationship between the plaintiffs and the defendants.

## Plaintiffs' Discovery of the Conduct of the Defendants

60.    During the administration of the Estate of Elmars Vitols, Robert Vitols, serving as co-executor and as an officer and shareholder in Vitols Tool & Machine Corp. and general

partner of Associates, first began to question the activities of CBIZ.

61.     Until in or about May, 2000, Andrew Zelenkofske, Kevin McCreery and CBIZ had maintained a fiduciary, confidential and professional relationships with each plaintiff and each defendant had repeatedly assured each Plaintiffs that they were protecting their rights and providing valuable services.

62.     Since May 2000, Plaintiffs have sought to determine the scope and extent of the Defendants' actions and have retained other accounting and other professionals to provide advice respecting Vitols Tool & Machine Corp.'s pension plan, tax responsibilities and business transactions and to assist Plaintiffs in amending certain tax returns previously prepared and filed by CBIZ and to address the failed succession plan developed and implemented by CBIZ.

63.      Plaintiffs, through their new counsel, sought documentation and other information, including specific information respecting the Insurance Trust, but were advised that CBIZ or Andrew Zelenkofske had lost or "purged" the requested information and documents.

64.     Robert Vitols, through his new counsel, asked Andrew Zelenkofske, Kevin McCreery and/or CBIZ to explain various filings, the numbers reflected in tax returns and the reasons for the differences in these numbers with other financial information; CBIZ and Andrew Zelenkofske provided no meaningful explanation.

65.     After months of investigation and attempts to determine accurate information, Plaintiffs have discovered that the defendants knowingly and intentionally or, alternatively, negligently, dishonored and violated these promises, representations and agreements. Instead, to save themselves the time, effort and expense of professionally performing the tasks as promised, represented and agreed, the defendants prepared tax returns and estate planning documents that were replete with errors, as a result of which Plaintiffs have been severely damaged.

66.     It is believed and averred that prior to their discharge, Andrew Zelenkofske, Kevin McCreery and/or CBIZ knew that no one had analyzed or would be likely to uncover the actions of Andrew Zelenkofske, Kevin McCreery and/or CBIZ in respect to the Plaintiffs and Elmars Vitols, and that for so long as Andrew Zelenkofske, Kevin McCreery and/or CBIZ were  the sole points of contact with the Plaintiffs, Andrew Zelenkofske, Kevin

McCreery and/or CBIZ further knew that they could conceal what Andrew Zelenkofske, Kevin McCreery and/or CBIZ had done, even if by so doing they would cause the Plaintiffs to incur substantial, avoidable tax liabilities and expenses and other damages.

67.    As a result of the conduct of the defendants, jointly and severally, Plaintiffs have been caused to suffer substantial damages, which damages are continuing into the future.  The full nature and extent of these damages are not now known.

68.    All conditions precedent to the obligations of the defendants, jointly and severally, to the plaintiffs as claimed herein have been satisfied.

## COUNT I

## BREACH OF CONTRACT/WARRANTY

**WHEREFORE**

## COUNT II

## PROMISSORY ESTOPPEL

thereby causing the damages claimed herein.

**WHEREFORE**, plaintiffs request judgment against defendants, jointly and severally, in an amount in excess of $50,000,                          and such other relief as the Court may deem appropriate.

## COUNT III

## BREACH OF FIDUCIARY DUTY/RELATIONSHIP OF TRUST AND CONFIDENCE

76.

**WHEREFORE**

**COUNT IV**

**<u>FRAUD</u>**

83.

**WHEREFORE**

**COUNT V**

**NEGLIGENT MISREPRESENTATION**

85.     The averments in the foregoing paragraphs are hereby incorporated as if set forth in full

herein.

88.

**WHEREFORE**

**COUNT VI**

**NEGLIGENCE/MALPRACTICE**

91.

**WHEREFORE**

## COUNT VII

## CIVIL RICO: 18 U.S.C. §1964

The actions undertaken by CBIZ in artificially and improperly inflating bills and in directing improper and fraudulent bills to the plaintiffs, constituted fraud perpetrated through the mails of the United States within the meaning of the mail fraud statute, 18 U.S.C.§1341.  Each of these included intentional misrepresentations designed to defraud plaintiff of professional fees.

94.    It is believed, and therefore averred, that there are numerous predicate acts of mail fraud relating to the CBIZ's scheme to defraud Vitols, and perhaps other CBIZ clients.

95.    These predicate acts, which comprise a pattern of racketeering activity within the meaning of 18 U.S.C. §1964.

96.

**WHEREFORE**

**POWELL, TRACHTMAN, LOGAN, CARRLE, BOWMAN & LOMBARDO, PC**

By:_____
          Paul A. Logan
          Attorney for Plaintiffs

**LAW OFFICES OF JOSEPH P. CANUSO**

By: _____
          Joseph P. Canuso
          Attorney for Plaintiffs

Dated:_____